Good morning, Your Honors. My name is Joseph Trojan. I'm counsel for Appellant Nina Parkinson. I would like to reserve five minutes for rebuttal. This comes to you on a de novo review of the dismissal of a complaint for trademark infringement. The trademark infringement complaint was dismissed based upon the district court's finding that there had been an assignment in gross of the trademark rights to Ms. Parkinson. In order to come to this conclusion, the court needed to ignore two other documents. The assignment to Ms. Parkinson was part of a... Let me ask you a question about this. I agree you could look at the documents as integrated. I don't seem to find in these discussions what it appears to me this contract or set of agreements was really about. The trademark in itself alone was assigned to her because her husband was going to be working for the company. No. It looks as if the assignment of the trademark was somehow to be a security issue. It was a security of some sort to enforce her husband's employment contract to see that he got paid. The leverage to see that he got paid seems to be that she would hold the trademark. If the contract went ahead and he got all his money, the trademark would go to them. If there was some kind of breach in the contract, although it's not very clear, she would have the trademark that she could hold back to try to enforce the contract. Isn't that what this was really about? No, Your Honor. Why did they give her the trademark? Ms. Parkinson had loaned the company $60,000. Which was going to be worked off, not by payments. No, she was supposed to be paid back under her agreement with the company. With Camelot. With Camelot. Camelot then ended up selling itself to Rwanda. Also, it's not her husband. It was her brother. Her brother worked at the company. Because her brother was there, she had loaned the company, Camelot, the $60,000. It's true. It wasn't structured as a security interest because you can record a security interest as well against a trademark. That wasn't the way it was structured. The parties are free to structure these deals as long as you don't end up with an assignment in gross. The key issue here is once they agreed to structure the deal this way, in section 1.3 specifically says that the buyer shall license all rights for use and distribution for that first five year period. That's in the sales agreement. Rwanda understood in its own sales agreement that it would be the rights. Then the rights would be assigned to Ms. Parkinson. Therefore, that's the exact reason why this is not an assignment in gross because the licensor receives the benefit of the licensee's use of the trademark. That's just Hornbook law for trademarks. The fact that to re-characterize the transaction would not be appropriate to simply say this was somehow a security interest and that's all we're talking about because that's something that the parties could have done. What did she get other than the trademark? Was she supposed to be paid? She became the licensor of the trademark and she did expect that she would be paid and she never was. Is there a provision for her to be paid? It wasn't a provision that she had that's in the sales agreement. It doesn't appear there. That's a separate agreement. Is it somewhere in the record? No, it's not in this record. Excuse me, counsel. Perhaps I misunderstood. I'm looking at ER 62 and quoting from the agreement, it indicates that Rwanda would have, and I quote, the complete and free use of the Maryland trademark for a period of five years from the date without compensation or consideration paid to Nina Parkinson as its registered owner. Correct. I'm not... So, she gets no consideration at all, right? Correct. She does not get consideration during that five-year period, but she does become the licensor under section, under the separate, one under 1.3. This is the problem with the assignment in gross. She didn't get the goodwill. She doesn't get paid anything. She has no ability to enforce it. What did she get? No, she does have the ability to enforce it because in the license agreement itself, it sets forth the terms under which she controls the quality of the goods. But weren't those all subordinated, though, to the rights of the other party? No, they're not subordinated for that five-year period because section 1.3 specifically says that during this five-year term, buyers shall license all of the rights. So, the buyer is entering into the sales agreement, understanding that for the first... They're buying the assets of the company. They're then using the Maryland mark to sell product. And they understand that when they bought it, they didn't pay full value for the company. They bought... They ended up getting the... Understanding that over that five-year term, there would be additional payments. We're not arguing about the payments. Additional payments to who? Not to Nina Parkinson. All right, but that's what I don't understand. Right, to her brother. But that... Her agreement with her brother is a completely separate issue and not a basis for... So, it was... I got the husband and the brother confused. But that was the purpose of giving her this trademark, was to ensure that her brother was being paid his employment contract. So, then she could be paid back the money she was owed. Otherwise, what would have had to have happened... She wasn't going to be paid according to the agreement. She was to receive... The side deal between her and her brother. Correct. And so, otherwise, Rubanda would have had to have paid an extra $60,000 for the purchase of the company in order to acquire those rights. They didn't want to pay that full amount. There wasn't an agreement to pay that much more. And so, then it was structured in this way, so that Nina Parkinson would then have the ability to... This was, in other words, she was given the trademark to hold over their heads to see that they paid her brother. Is that right? I don't... No, I don't think that that's completely correct. I mean... Well, I'm just trying to understand what this whole deal was about. Why she got the trademark? Did she get the goodwill? She did get the goodwill. In what document? She got the goodwill in the assignment itself, which is... Assignment of what? In the assignment of the trademark to her, which is... But there was a separate asset purchase agreement. I thought that the goodwill was separately conveyed in that document. The assignment was a document that was a part of the package, the integrated package that occurred. And, in fact, it refers to the buyer's closing obligations that the buyer... That's Robonda. Correct. But the concern was that it was referred to in Robonda's obligations because they may have needed to sign off on it. But who got the goodwill? Nina Parkinson. And you say she got it by virtue of the assignment of the trademark? Correct, because that's at ER 50. Where is it? ER 50. ER 50 is the trademark assignment. And it says, Transfers to the assignee all rights, title, and interests in and to the trademark and registration and any renewals thereof in and to all goodwill symbolized by and associated with the business conducted under the trademark. So it was clearly an assignment of that trademark. And that was not simply a naked... I mean, not a naked license, an assignment in gross because she immediately was licensing the entity that was doing the selling. What about the goodwill of the business apart from the trademark? Well, the... Was there any? Well, the good... I think every ongoing business has goodwill. And so that goodwill in the business was, with respect to the trademark, was sold to her. If a business has other goodwill not associated with its trademarks, that's certainly possible. What I'm wrestling with is the Ian J. Gallo case that requires that there has to be a supervisorial right to ensure, in quotes, the continuity of the product or service symbolized by the mark. Correct. So my question is, in what way did the assignment of the mark permit that to occur? Because it was part of the sales agreement where the goodwill that Camelot had built up that in its sales of the product was simply transferred to Rwanda. It continued those sales, and those sales continued pursuant to a simultaneous license to Rwanda, the trademark rights, for five years. And at the end of the five years, then everything automatically went to Rwanda? That's correct, assuming that everything goes okay during the five... Well, that gets back to Judge Reinhart's security question. Wasn't this really just a disguised security agreement? Basically, no, it's not. A disguised security agreement is a different animal than a license. A disguised security agreement doesn't come with the ability to control the quality of the goods that are in the license. But when you have an agreement that, for where she's receiving, no consideration for the license, and at the end of five years, the trademark automatically goes to Rwanda, I don't understand that. I don't get where Ian J. Gallo has complied with that. No, she is getting consideration. In what way? She's getting consideration because she... It's kind of like if she's fearing that if she doesn't... Her husband may be getting some consideration, but I'm talking about her. She's the licensor, right? Right, she is a licensor. But she's not... Someone could license their trademark for free and it would not constitute an assignment in gross just because you chose to license it. She'd have to retain control. Right, and so she does retain control. She has absolute control over the quality of the goods because the licensing agreement specifies specific terms for her to exercise control over any new products that are introduced, to be able to see those products, to be able to have samples sent to her during the term of the five years. Let me ask you, so at the end of the hearing in front of Judge Reel, you asked for leave to amend. Correct. And he said no. Correct. No way, there's... Given what we've got here, there's just... It would be futile. Right. What would you... What additional allegations would you add to the complaint if you had the opportunity? It came... To amend. It came down to, in the beginning of his statements for his reasons for a decision, he stated, she did not sell anything. And based upon that fact, I find that it's an assignment in gross. That was his, at least the reasoning, the factual underpinnings of his decision. So, and then I said, in that same part of the transcript when I was going to make my offer of proof, I said, well, then I'll show that she was the licensee, so therefore their use in order to her benefit, because that's what happens under a trademark license. The licensee's use is in order to the benefit of the licensor. So the fact that she's not using or selling herself does not mean that she's not conducting business under the trademark. She is. Under the Gallo decision, there doesn't have to be a complete transfer of the assets. Correct. But in what way would she possibly be damaged if there had been a breach of the license agreement? How could she possibly be damaged? She's... Her ability to exercise control over her property, over the license, is essential to the effectiveness of that license. And the issue is, as far as the damage, the damages arise by failing to comply with the license. Judge Smith was asking about goodwill earlier. This letter from Nina Parkinson to Rotunda, which was part of this, what we would call the integrated agreement, says, You have purchased the inventory and goodwill of the Maryland brand. Well, that's a... In the sense that at the end of five years, they would acquire it, but then you... It doesn't say that. It doesn't say... You've purchased the inventory and goodwill. You don't get the inventory in five years. You're absolutely correct, Your Honor. I cannot dispute that language, but what I can refer you to is to ER 50, which has the actual trademark assignment, which is the accurate representation of what was assigned. And in that document, it's clear that it expressly says that the goodwill symbolized and associated with the business conducted under the trademark, that that goodwill has been assigned. What do we do if those are in conflict? Well, then you... They're not in... You recognize that there can't... Only if there's goodwill. Right. And one says you're conveying goodwill. The other says it's conveying goodwill. How do we deal with that? Well, then you would look to the sales agreement that says that there is this license, that they are licensing it. So you have this third document that says that. But also, the court's already pointed out a way around that problem, which is just to recognize that there's more goodwill associated with the business than just the goodwill and its trademarks. Was this December 1st, 08 letter attached to the complaint or referred to in the complaint? Uh, yes, Your Honor. This should be... It was properly before the district court. Correct. Correct. Okay. And also on the amended complaint. I'm seeing I'm way out of time, so I'll just close here. Thank you, Your Honor. Thank you, counsel. Good morning, Your Honors. David Mays for Rabanda. I think Your Honors have hit upon one of the key facts in this case, which is the way this underlying deal was structured. Tony Parkinson, he's Nina Parkinson's sister, Tony Parkinson split this deal three or four different ways. He had the APA, which is part of the primary exhibit here, about the purchase of the brushes, the Maryland line, the goodwill, being able to use the trademark, and then he also had a personal services agreement. I don't know why. No one really knows why. For him to be paid for a period of five years, after which the trademark would inert to Rabanda. There was an underlying litigation here, arbitration, in which the arbitrator decided against Mr. Parkinson on matters related to that personal services agreement. Only after that decision did Nina Parkinson attempt to enforce her trademark assignment. The problem with anything related to this trademark assignment is that it's not valid, because the goodwill was transferred very clearly in the APA to Rabanda. Rabanda had no obligation... Very clearly in the APA with the... I'm sorry, the asset purchase agreement. To Rabanda. Rabanda had no obligation to Nina Parkinson. Not in money, and not in ceding control. Let me ask you, because I can't find, unfortunately, in what I have here, I can't find the agreement which opposing counsel says gave her the goodwill along with the trademark. It didn't. There is no such agreement that gives her... The goodwill, the trademark assignment, the purported trademark assignment, is what I'm calling it, in October 1, 2008, the counsel referred to, that happened a month before the date of this asset purchase agreement, recited the transfer of goodwill. But recitation of the transfer of goodwill is not enough under the law. That's clear in Mr. Donut. That's clear in the other cases that talk about what really needs to happen for a transfer to be valid. Now, we don't really know what, if anything, was transferred in that assignment. Nina Parkinson didn't control the company. Nina Parkinson didn't produce any goods. Nina Parkinson didn't get hard assets. Nina Parkinson didn't have a business plan. But we do know what was transferred in that purported assignment by looking to the latter agreement a month later, in the asset purchase agreement. When we look at that, that informs us that nothing was transferred because you can't split the goodwill of this business and you can't first transfer it purportedly to your sister and take that same goodwill and sell it to my client. That shows us that nothing was actually transferred, that in fact, as your honors I think correctly pointed out, Mr. Parkinson was trying to retain some sort of security for his salary under the separate personal services agreement. And in fact, that's what he did. In the sale of the assets agreement, does it mention goodwill? It mentions it, I think, in the first page. Purchase and sale of assets. And it includes specifically goodwill? It includes property, customer rights, transfer of the purchased assets. There's nothing excluded. There's no reference to Nina Parkinson. There's no reference to the goodwill being transferred separately by another third party. But there's reference to the license. But reference to a license in this agreement that wasn't valid to begin with is a non-event. I haven't read the agreement. It's kind of hard to read the agreement. But does the agreement make reference to the assignment from Tamalot to Parkinson the month earlier? I don't believe it does. I don't actually know. Well, when it provides for Rabonda signing the license, they must have understood that Parkinson had the mark. Nina Parkinson? Yeah. They were buying this line. So the agreement refers to a license, that Rabonda is supposed to sign a license. And it says it's attached to Exhibit 1. But I couldn't see Exhibit 1 attached. Frankly, this APA has all different versions. Oh, whatever. No, my point is that simultaneously when they signed that asset purchase agreement they must have known that Tamalot had assigned the mark to Parkinson. But they're I'm not going to speak for them. Why would they sign the license? What they're trying to do is get the line and the trademark. They're just business people. They just want to sell Rabonda. So whomever may have controlled or not controlled the license to them in this agreement, as long as they were getting the right to use it and didn't have to make payments except to Tamalot and that's what's contained in the agreement that's all they cared about and move on. Now, if that assignment was invalid it doesn't matter whether it's referenced here and it doesn't matter whether they were aware of it. That assignment, the trademark from? The October 1st purported assignment to Nina Parkinson. So, what the District Court did here was say as a matter of law these facts that you've alleged state no claim for relief because that assignment is invalid. Correct. And the assignment is invalid because it's nothing more than an assignment in gross. Correct. Just of the mark. No goodwill. Council points to Judge Rial's transcript of the hearing. He does say something about assets not being transferred to Nina Parkinson. We all understand from the law that that's not required. But that's not the only thing he said. He said no goodwill was transferred. Without trying to read his mind because we only have a short transcript from the hearing if you look at what was alleged in the complaint, the complaint talked about the APA and the goodwill being transferred. That's not disputed. Well, goodwill the way I understand from Gallo is that goodwill can be transferred if there's sufficient control is retained by the licensor. Yes, but this isn't the reason this isn't Gallo In Gallo, there's a settlement agreement in which the wine company, Ernst and Giulio Gallo, received ownership of the trademark. They then assigned it with a license back. A direct transfer between owner and licensee. Here, you have owner who transfers goodwill here and then a month later goes to try to transfer that same goodwill here. It's not a direct assignment and license back. Why doesn't the same principle apply though? As long as she has or can allege that she has sufficient she's the owner, has the mark and has control why isn't that sufficient to meet the test of Then where is she in the APA? Why is this side deal You read that APA and it talks about Rabband is signing the license and it says the license is attached as Exhibit 1 but it's not attached in my But there's no obligation here to Nina Parkinson in this APA There's nothing that talks about I agree with you, Your Honor, perhaps if that had been the way the deal was supposed to be structured, if that's the way the parties actually did it they said, you know, we're going to transfer all the assets and the goodwill to business we have this assignment so she's going to control the quality. That's nowhere in the papers that's nowhere in their complaint because it's nowhere in the documents that become part of this deal All it was, was a security for her brother to be sure he got paid and when he was denied in the arbitration and the arbitrator decided that he had been paid everything he was owed lo and behold, a month later a letter comes saying we're pulling the trademark That is you can't do that. It's not a tool to be used to get paid on a side deal. Trademarks are supposed to go with the products that's the underlying policy that's the underlying reason why we have prohibitions against assignment and growth so people can't trade them like commodities on Wall Street. You have to have products and goodwill to go with it Part of our problem seems to be figuring out what this agreement consists of The letter from Nina Parkinson describing the licensing agreement seems to be Exhibit 1 and therefore part of what you call the APA Now I don't know what the effect of it is because as I said before the letter says to Robonda you have purchased the inventory and goodwill of the Maryland brand from Camelot That's incorporated into the basic agreement I'm not quite clear what where the licensing agreement is or whether that is attached as an extension of the contract I think you hit upon a key phrase there Robonda is purchasing the inventory and goodwill of Camelot Of Camelot Not of Nina Parkinson Not of the trademark of Camelot Camelot was the party selling it I say I think that's one of the problems that appears that the agreement incorporating the letter from Nina Parkinson who says that Robonda has purchased the inventory and goodwill maybe there's something else in some other agreement that says But then we're in a position where they're trying to sell it twice Well wait a second For my purposes it would really be helpful to know where the license is In paragraph 1.3 of the asset purchase agreement It says that during this five year term buyers shall license all rights for use and distribution under a separate agreement attached as exhibit one Is the letter that Judge Reinhart keeps referring to is that exhibit one? Is that the license? Very possibly Again we have this document has the one that was in the arbitration for example didn't have all the exhibits with it so there's all different versions of this I'm not trying to hide that I was reading this I read that and I thought let me look at exhibit one and you look to exhibit one and it's not the license It's exhibit D I don't know It just doesn't make sense I couldn't figure out what was going on Bottom line from your perspective you can't transfer the trademark without transferring the goodwill So in this case they allegedly transferred from Camelot to Nina Parkinson the trademark with goodwill Then you have another agreement a month later where the same entity purports to transfer the goodwill and the assets to Robonda So at the very least if the allegation is correct then you've got a double transfer of the same asset which in and of itself I suppose is a form of fraud that's not before us but the reality is you can't have it both ways Was Nina Parkinson a signatory to the APA? No So she received no consideration in connection with her allowing the trademark to be used by Robonda Is that an issue that we should be thinking about? Do you have a valid contract with that consideration? I don't believe we do That wasn't the argument that was advanced before the district court No it wasn't because that initial transfer that initial assignment isn't valid The latter transaction really informs the former because you have something that recites goodwill transfer but it's not enough to recite it These cases say you have to show that it occurred and it could not have occurred because the entire product line that Camelot was selling that was purportedly transferring the goodwill to Nina Parkinson a month earlier was transferred to Robonda who went out and made these brushes who went out and sold these products as part of a purchase agreement where they bought it from Nina Parkinson's brother So I think when you and trust me I've tried for years to unravel this transaction, it's not that easy but when you piece it apart a little bit I think what you see, what's revealed is that Mr. Parkinson had tried to create this assignment in order to create nothing more than a security interest for his salary or his money he was supposedly getting under this separate other agreement that he had with Robonda for personal services. When that agreement ended up going south on him and he ended up getting a ruling against him, his sister tried to pull the trademark. But that original assignment was never valid It's a legal nullity It really never happened because nothing the proper way to structure this deal if that's what he wanted to do there may have been a way to structure it maybe Nina Parkinson becomes part of the APA maybe it's distinguished in the purchase agreement Was this argued in the district court that there was a transfer of a trademark and goodwill to Nina Parkinson but it was invalid because there was no consideration? Correct. Was that argued to Judge Real? Yes. Judge Real in his decision references that it was never transferred the argument was that because it was transferred later in the purchase agreement it could not have been transferred earlier That's not a good argument. The argument that you transfer something and then you later sell it to a second person doesn't make the first transfer invalid Correct. If Nina Parkinson had sold it to Robonda but she didn't Camelot sold it to Robonda the same entity that owns it sold it to two people a month apart So what does that have to do with the sales of the first person? If you sell it to you'd think that the one you sold it to first would be the owner and you try to sell it again you can't sell it if you don't own it any longer. Well, ownership is a whole other issue here as briefed at the end where this other partner of Mr. Parkinson's has a trademark assignment as well in the trademark record claiming that they own this trademark as well Well, trademark. It's a Vandux I wish it were more valuable Your Honor, I really do. My client does too But this Vandux company out of South America who partnered with Mr. Parkinson prior to any of this happening has a recorded assignment to them claiming that they also own this trademark. They're not a party here, perhaps because service in South America is expensive and difficult How much is involved in this whole dispute? Sorry? How much is involved in this whole dispute? Because I can see you're going to spend the next ten years in court We've already spent the last five years in court Well, I mean 90% of this case is resolved through this arbitration How about the last 10%? The last 10% could be the bugaboo of the entire thing I'm serious. How much is involved in this dispute? The line is doing okay The line's not doing great. My client I think is interested in possibly trying to find a buyer for it They take old lines, especially make-up and stuff, and they try to make them new again They try to make them viable. They take broken-down product lines and try to do that with them They tried to do that with this one, they couldn't really do it Did it need any effort, the two of you, to resolve this dispute lately? Not lately I mean, you know, clearly for my client to be able to sell the line they need to have the rights to the trademark which should have reverted to them after five years and we're past that I was wondering I'll ask your opponent also whether this is the kind of case that we might send to mediation We have a very effective mediation department that resolves disputes that should be resolved rather than going up and down repeatedly in the court system To be completely honest, your honors if we were just dealing with Nina Parkinson that might be the case, but we're always dealing with her brother who has put us through every ringer of litigation possible in the underlying cases. I don't expect this to be different, I don't expect him to want to settle this without extracting more than a pound of flesh on this thing, and I don't I'm not saying that it couldn't resolve I'm always open to resolution Well, I was just curious If there's no further questions Thank you, Your Honors May I just have one more minute, Your Honor Do you see any possibility of possible settlement short of a pound of flesh? Tony Parkinson, if I did not represent him and his sister and the sister and brother are estranged so there is I'm like a really happy family Is your tribe capable of settling this whole dispute? We would love to settle it Your Honor We went through the Ninth Circuit mediation process before and it really was the appellee who wasn't too interested at that point because they had won I think by now he may be interested Well that's encouraging So you've already gone through the Ninth Circuit process? Yes In this particular case? Yes Was that before or after the arbitration? I'm not involved in the arbitration, I believe it was after I believe the arbitration was decided a while ago My client was not involved in the arbitration, she had nothing to do with it So Are you your client and your opponent here, are you capable of resolving this dispute if the two of your clients agree? We're more than happy to talk settlement at any point You don't have all the parties represented right? No we do because this case has nothing to do with He's not a party to this What about the person who has the registration and the trademark in the patent office? That was a case in Florida and it's actually referred to in the agreement that they have to pursue the litigation and that was one of the obligations of the seller to continue the litigation and I believe that that has been resolved and so they no longer have a claim and it wasn't his partner it was a company he had worked for and it wasn't his brother, it was his cousin and they don't like the uncle and all of these things are outside the scope of the pleading This is a motion to dismiss on a 12B6 and these are all issues that go far beyond that but I would really appreciate if I could just have one moment to explain a key issue that keeps coming up with respect to the resolution of the issue of the assignment of the goodwill to Robonda is once again in the first sentence, I've only referred to the second sentence of section 1.3 the first sentence of section 1.3 specifically it's at ER38 which is the asset purchase agreement and that says that it's not until the end of the five years that Robonda acquires the trademark Oh no, that's clear So the fact is that's all true if she has the trademark No, no, Robonda, the buyer does not acquire the trademark until the end of five years But it does acquire the goodwill Well it can't acquire the goodwill for the trademark if the trademark has been assigned with the goodwill You distinguish the goodwill of the trademark, whatever that may be, and the goodwill of the company There can be separate goodwill associated with other aspects of the company What's an assignment of gross then? An assignment, and I'm glad you asked that I am too An assignment of gross the policy behind it is that people don't own words and can't simply have a word separate from the sale of a product in commerce And when someone tries to own a word through the trademark clause, they can't do that It needs to be associated with sales in commerce with respect to specific goods Then it becomes a trademark and protectable The assignment in gross has not been violated here because with all these agreements together, she was the licensor of the licensee who was continuing the use of the trademark in commerce Who was the corporate lawyer that put this together? This was put together in Florida So this had nothing to do with how this was put together It wasn't done here in California Rabonda's in San Diego Maybe they had something to do with it Rabonda clearly agreed to it And then the final thing I just want to say is that if you look at section 4.2, no, 4.3A you will see that they knew that there was going to be an assignment of the trademark because the buyer might have to sign off on that document And then in section 7.6 it talks about transfers of all third party agreements So it talks, sellers shall execute all documents and That's the seller That's Camelot, right? Which according to you has already transferred everything there is to be transferred in the trademark assignment to Nina Parkinson Correct, but this document, the  agreement contemplates and makes it an obligation for the seller to transfer those rights to provide the documents associated with the transfer of all third party agreement relating to this transaction. The only third party is Nina Parkinson. Where's the license from Nina Parkinson to Rabonda That's at ER52 Hold on, ER 52 Which is the letter agreement that contains Hold on, hold on, ER52 Does it say It's at the bottom of the page Hold on a second That's the letter That's the same letter So that's the license? That became the license That's the authorization. A license is merely an authorization from the trademark owner to use the trademark just like a patent license. It's just an authorization of the owner to use the intellectual property And then it goes and specifies in this letter what the quality control provisions are and it's very detailed So that's the license And that makes it clear this is all a security agreement for this brother to secure his salary In this, what you call a license agreement, it says you have purchased the inventory and goodwill of the Maryland brand and entered into an arrangement to use the services of Tony Parkinson for a period of five years from this date under which he is compensated at the rate of ten, etc. This is all to get the brother's salary paid and now she doesn't even like the brother And in this same document as my colleague just read you have purchased, meaning Romanda has purchased the inventory and goodwill of the Maryland brand. So, you know, the licensor Nina Parkinson is saying you, Romanda, have purchased that from Camelot So what did she get? She received the anticipated Then there's a side agreement that needs to be brought in. It's not a part of the complaint How can it possibly be out of the complaint if you're relying upon it to show there was a valid transfer of the trademark? Well, if that becomes the issue, then I should have a right to amend to say so So it's dismissal on a I'm completely out of time, but dismissal on a first motion to dismiss on a situation like this where we can't even agree completely on everything clearly was improper. Thank you All right Thank you all very much Very entertaining arguments Case just argued will be submitted
judges: Reinhardt, Paez, M. Smith